John C. Weber, Appellee, v. Fred Buck et al. Thomas Mack and Greta Unfried Mack, Appellants.

Gen. No. 40,703.

Opinion filed November 27, 1939.

GURDON WILLIAMS, of Chicago, for appellants.

LAURENCE M. FINE, of Chicago, for appellee.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

May 12, 1937, plaintiff filed his complaint in chancery to foreclose the lien of a trust deed on certain real estate. The note for $3,500 and the trust deed were dated April 20, 1920. When the note came due April 20, 1925, the date of payment was extended for a period of five years, or until April 20, 1930. Plaintiff claims he purchased the note and trust deed about March 11, 1937. The complaint asked for the usual relief. Defendants, Buck and wife, were not served with processes and did not enter their appearance. Thomas Mack and wife, who are the owners of the equity, contested the suit contending that plaintiff was not a holder in due course for valuable consideration. Afterward an order was entered referring the matter to a master in chancery to take the evidence and report his findings solely as to the ownership of the note and trust deed. The master found in favor of plaintiff. Objections to his report were overruled, they were ordered to stand as exceptions and the court entered a decree that the exceptions of plaintiff and of defendants "be and they are overruled, in so far as they are not in accord with the findings of the court." The decree further found plaintiff was the owner and holder of the note and trust deed with the right of foreclosure and that defendants Mack "are estopped to interpose their claims and defenses"; that they are "guilty of laches in that they have failed to make any claim against said trust deed and note and have failed to assert their rights, if any they had, for a period in excess of ten years"; and it was further found that the Macks were in possession of the premises, which were improved by a bungalow, and it was ordered that they be required to pay $40 per month "commencing with the 1st day of January, 1929, and for every month thereafter."

It is from this order or decree that the defendants Mack appeal.

The record discloses that on April 20, 1920, Fred Buck and wife executed their note for $3,500 payable five years after date, with interest at six per cent, and executed the trust deed in suit to secure the payment of it. Afterward, apparently, Reed W. Gainey and wife owned the equity of redemption and on April 20, 1925, the time of payment was extended five years. Interest coupons were properly executed evidencing the semiannual interest. Defendant, Thomas Mack, a lawyer, had owned and operated an unincorporated business known as the Rezilite Manufacturing Company since 1919. Lillian C. Thesen, daughter of Elizabeth Barthel, was a lawyer and had been employed continuously by Mack for 15 years prior to October, 1930. She was confidential secretary, office manager and had complete charge of the books and business of the company; issued and signed checks, Mack being "on the road most of the time." Miss Thesen also had access to Mack's investments and on many occasions would detach, cancel and surrender interest coupons.

April 20, 1925, Mack bought the note and trust deed from Cochran & McCluer Company, who were engaged in the real estate business in Chicago, paying therefor $3,605, the face of the note, and $105 semi-annual interest. Miss Thesen drew the check of the Rezilite Manufacturing Company in payment of the note and trust deed, which were placed in Mack's office vault.

Shortly after the purchase of this mortgage Miss Thesen advised Mack that her mother, Mrs. Barthel, with whom Miss Thesen lived, wanted to invest about $3,000 in a real estate mortgage. Mack told her to look through his securities and pick out one for her mother. About that time Gainey, the then owner of the equity, paid $500 principal and accrued interest reducing the amount due to $3,000. The substance of the evidence is that Miss Thesen bought the so-called "Gainey mortgage" for her mother and advised Mack that her mother paid for it.

The evidence further shows that in the winter of 1928–29, Mack was contemplating buying a new automobile, turning in the old one he had in part payment. He advised Miss Thesen of this fact and it was decided that in place of turning in the old car (for which he was to receive a credit of $2,350 in part payment of the new one) he would sell the old car to Miss Thesen's mother for $2,000. Mack testified that on April 11, 1929, he executed a bill of sale for the automobile to Mrs. Barthel. A duplicate of the bill of sale was produced by him and is in the record. It recites that in consideration of the assignment to Mack by Mrs. Barthel of two-thirds interest of $2,000 in and to the Gainey mortgage and trust deed, Mack sold and delivered the automobile to her. He further testified that on that date he delivered the automobile, put it in Mrs. Barthel's garage and delivered the bill of sale to her; that at that time the Gainey mortgage was in his vault; that in October, 1930, Miss Thesen left his employ because he found it necessary to reduce her salary; that afterward he learned the mortgage was not in his vault but apparently was in the possession of Mrs. Barthel, and in April, 1931, he tendered Mrs. Barthel $1,190.45, for her one-third of the Gainey mortgage, and demanded the mortgage and trust deed, all of which was refused.

The evidence further shows that in endeavoring to obtain the mortgage from Mrs. Barthel, Mack employed Arthur Carlsten, a practicing attorney in Chicago to represent him, and from 1931 or 1932 through to 1935 they had a number of conferences for the purpose of effecting a settlement with Mrs. Barthel, and he tendered a certified check to Carlsten to be turned over to Mrs. Barthel; that he also gave Carlsten $100 for his services in the matter.

Some time afterward Gainey, the owner of the equity in the encumbered property, learned of the fact that there was a dispute between Mack and Mrs. Barthel as

to the ownership of the note and trust deed and on August 14, 1931, he filed his bill of interpleader in the superior court to determine to whom the money was due, as he was endeavoring to secure a new loan of $5,000 on the property and desired to take up the note and trust deed. Afterward Mack became the owner of the property through foreclosure of a second mortgage which he held and apparently, in view of these facts, Gainey was no longer interested in the property, and on August 27, 1934, the interpleader suit was dismissed for want of prosecution.

The evidence further shows that shortly after the complaint in the instant case, which was filed May 12, 1937, Mack caused an audit to be made by a certified public accountant of the books of the Rezilite Manufacturing Company and for the first time learned that he had not been paid by Mrs. Barthel the $3,000 for the mortgage.

Miss Thesen and her mother, Mrs. Barthel, gave testimony to the effect that Mack had been paid for the mortgage at the time of its purchase. They also testified in substance that Mrs. Barthel had not bought the automobile from Mack; that Mack had delivered the automobile, put it in their garage, and it had been used by Miss Thesen; that neither Miss Thesen nor her mother bought it from Mack but on the contrary they refused to do so.

The evidence further shows that in January, 1929, Miss Thesen got a State license in her own name to drive the automobile; that afterward she or her mother had certain repairs made upon the car, some of which were paid for by one or both of them and some by checks drawn by Miss Thesen on the Rezilite Company.

Mrs. Barthel testified in substance that about March 11, 1937 she sold the note and trust deed to plaintiff, Weber, and that he handed her $2,400 either "Check or cash"; that the deal was made at her home; that a real

estate man, Nicholson, was with Weber. (Nicholson was not called as a witness.)

Plaintiff Weber, on June 15, 1937, testified that he obtained the note and trust deed and other papers from Attorney Carlsten in his (Carlsten's) office in March, 1937 and that Carlsten was one of the attorneys appearing for him in the instant suit; that he took the money over and gave it to Carlsten who turned the papers over to him; that Mr. Nicholson, the real estate man in the deal, was present; that at the time he obtained a bill of sale, which is in evidence, from Mrs. Barthel for the note, trust deed and other papers. It describes the note, trust deed, extension agreements, etc. Among other things, the following appears in this document: "To have and hold all and singular the said notes to the said John C. Weber and his executors, administrators, and assigns to their own use and behoof forever.

"And I hereby covenant with the grantee that I am the lawful owner of the said notes and that I have good right to sell the same aforesaid."

On cross-examination Weber testified that the deal took place in the office of Carlsten, who was his attorney;—that Carlsten and Fine, were his attorneys and that he paid $2,400 for the papers; that his intention was to buy a home and he knew he would have to take some legal steps to get title through foreclosure. "I wanted to and offered to buy this paper about April, 1937, but they didn't seem to get into any understanding between themselves. She offered to sell it — she wanted $1,000 more and different things turned up, and then, she finally refused to sell it. It was two or three weeks prior to March 11, 1937, that the matter first came to my attention." That nothing was said to him about a dispute as to the ownership of the mortgage; that his lawyers did not tell him anything about that matter. After this testimony was given the matter was

continued from time to time before the master, and about six months afterward, viz., February 24, 1938, Weber was recalled for further cross-examination and testified he did not see Mrs. Barthel or Miss Thesen until after he got the mortgage; that he took the bill of sale for the papers "to prove that she [Mrs. Barthel] was selling a mortgage, that she more or less guaranteed was all right"; that he knew he needed nothing further to transfer the title validly other than to hand over the papers; that Mr. Carlsten did not tell him Mack was making a claim to the mortgage. Some days after giving this testimony, viz., March 28, 1938, Weber was again called for further cross-examination. He then testified that he paid the $2,400 for the mortgage "partly cash and partly note. $1,500 cash and $900 note. I believe notes were made payable to bearer. No collateral. The notes were signed by me alone. Guaranteed by nobody. I think there is three or four notes. I don't know when they were made payable. I have paid none of them. My intention was to pay so much a year, as much as I possibly could. . . .

"I have paid no interest on those notes. There were interest notes. I am not in default. . . . The $1,500 was paid in currency. I turned the currency and notes over to Mr. Nicholson who drew up the notes. I turned the cash and notes over to Mr. Nicholson in his or in Mr. Carlsten's office"; that he had been out to Mrs. Barthel's house; he was then asked whether Mrs. Barthel said anything about Mack's claimed ownership or lien against the mortgage. His answer was "I don't think so. But there was so much discussion there about various things—it was principally that it would have to be foreclosed. I don't remember whether there was a discussion as to whether Mr. Mack claimed an interest in the mortgage. . . . Then I hired Mr. Carlsten to be my attorney to foreclose the mortgage."

Arthur Carlsten, called by defendant, testified he was a practicing lawyer in Chicago; that he knew Miss

Thesen and had represented her as attorney but not in connection with the mortgage in question; that he tried to get a sale for the mortgage for Mrs. Barthel; that he did some work in connection with the mortgage for her "prior to the appearance of Mr. Weber as owner"; that he had negotiations with defendant, Mack, and at that time represented Mrs. Barthel; that now he and his associate, Mr. Fine, represented Mr. Weber solely; that at the time Weber acquired the mortgage, he, Carlsten, was representing Mrs. Barthel; that he had nothing to do with the sale of it to plaintiff Weber; that he had known Mr. Nicholson, the real estate man, for 20 years; that it was through him that he met Mr. Weber; that he had negotiations with Mr. Mack previous to the Weber deal, "The negotiations pertained to this mortgage. About two years ago, Mack brought me $1,000, plus $100 for my fee in an effort to dispose of the interest of Mrs. Barthel in the mortgage. . . . He wanted me to prevail on them [Mrs. Barthel and Miss Thesen] to take this money for their mortgage"; that he did not discuss anyone's interest in the mortgage with Mr. Weber; that after Weber acquired the mortgage from Mrs. Barthel he came to Carlsten's office and asked Carlsten to represent him. That he did not tell Weber anything about Mack's claim to the mortgage; "I don't think I told him there was any claim."

There is considerable other evidence in the record but we think it unnecessary to refer to it.

The master found that the mortgage and trust deed had been removed by Miss Thesen from the vault of the Rezilite Manufacturing Company and delivered to her mother, Mrs. Barthel; that neither Mack nor the Rezilite Company was paid anything for the mortgage or trust deed by either Mrs. Barthel or her daughter; that Mack thought the mortgage had been paid for by Mrs. Barthel and did not learn that this was not the fact until after the instant foreclosure suit was

brought; and further that the evidence was insufficient for him to find that Mack had sold the automobile to Mrs. Barthel and that she had agreed to give him a two-thirds interest in the mortgage in payment for it. There was a further finding that Miss Thesen acted as agent for defendant Mack and not for her mother in delivering the mortgage and trust deed to her mother, but if she had received any money to pay for the mortgage she would be acting for her mother. And further "I find as a conclusion of law that to establish the embezzlement or larcenous taking of said Gainey mortgage by Lillian C. Thesen from Thomas Mack requires proof beyond a reasonable doubt"; that the burden on this question was on the defendant Mack; that Weber acquired the mortgage in good faith without notice that Mack claimed any interest in it; "That the testimony of Lillian C. Thesen, called as a witness in behalf of the plaintiff, John C. Weber, was impeached in material respects and is unworthy of belief; that the said Lillian C. Thesen was not a credible witness."

The conclusion of law by the master, which seems to have been approved by the chancellor (that where a crime is charged in a civil suit, the proof to establish such must be beyond a reasonable doubt), is no longer the law in this State. *Sundquist v. Hardware Mut. Ins. Co.*, 371 Ill. 360. The law only requires that such contention be proved by a preponderance of the evidence. We are in accord with the finding of the master, which was apparently approved by the chancellor, that Mack was paid nothing for the trust deed and mortgage by Mrs. Barthel or her daughter, Miss Thesen. We think all the reliable evidence is to this effect, that Miss Thesen took advantage of her position and deceived Mack who placed implicit confidence in her.

We are unable to agree with the finding that plaintiff Weber acquired the mortgage in good faith and without notice that Mack claimed an interest in the

mortgage. The overwhelming weight of the evidence is that the claimed purchase by him was merely colorable. The mortgage was seven years overdue; no interest had been paid during that time; taxes for the years 1929, 1930, 1931, 1932, 1933, 1934 and 1935 were in default. Attorney Carlsten knew that there had been a controversy between Mack and Mrs. Barthel over the ownership of the mortgage for a number of years. He knew that the bill of interpleader had been filed by Gainey setting up such a controversy. He testified that he represented Mrs. Barthel in connection with the mortgage and had negotiated with Mack; he was tendered $100 for his services by Mack in this respect. Nicholson, who was said to be the real estate man in connection with the purchase of the mortgage by Weber from Mrs. Barthel, was not called as a witness. The testimony of Weber as to what and how he paid for the mortgage is unsatisfactory. All equitable defenses to the foreclosure suit brought by Weber in the instant case were available to Mack. *Olds v. Cummings,* 31 Ill. 188.

In Daniel on Negotiable Instruments, Vol. 2, 7th Ed., sec. 904, the author says: ''the holder, in order to acquire a better right and title to the paper than his transferrer, must become possessed of it before it is overdue. When transferred on or before the due date by the payee, the purchaser is a holder in due course. For if it were already paid by the maker or acceptor, and had been left outstanding, it would be already discharged, and they would not be bound to pay it again to anyone who acquired it after the period when payment was due. And if it were not paid at maturity, it is then considered as dishonored; and, although still transferable, in like manner and form as before, yet the fact of its dishonor, which is apparent from its face, is equivalent to notice to the holder that he takes it subject to its infirmities, and can acquire no better

title than his transferrer. The doctrine applicable to this subject has been admirably stated by Chief Justice Shaw, who says: 'Where a negotiable note is found in circulation after it is due, it carries suspicion on the face of it. The question instantly arises, why is it in circulation? why is it not paid? Here is something wrong. Therefore, although it does not give the indorsee notice of any specific matter of defense, such as set-off, payment, or fraudulent acquisition, yet it puts him on inquiry; he takes only such title as the indorser himself has, and subject to any defense which might be made if the suit were brought by the indorser.' " Citing *Fisher v. Leland,* 4 Cush. (58 Mass.) 456.

From what we have said it is unnecessary to say here whether section 52, of our Negotiable Instruments Law (Ill. Rev. Stat. 1939, ch. 98, sec. 52 [Jones Ill. Stats. Ann. 89.072]) which defines the holder in due course to be one who "became the holder of it before it was overdue, and without notice that it has been previously dishonored, if such was the fact" or section 58, of the same chapter, which provides that "In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable" are applicable.

For the reasons stated, the decree of the circuit court of Cook county is reversed and the cause remanded with directions to set aside the decree and to award the note and trust deed to Mack and to dismiss the bill for want of equity.

*Reversed and remanded with directions.*

MATCHETT, P. J., and McSURELY, J., concur.